We'll hear argument next in Case 10-1472, Kouichi Taniguchi v. Kan Pacific Saipan, Ltd. Mr. Freed. Mr. Chief Justice, and may it please the Court. Our brief lists six categories of authorities demonstrating that the work of an interpreter under 28 U.S.C. section 1920, parent 6 is limited to spoken communication. Primary among these is the Court Interpreters Act itself, whose central provisions afford simultaneous or consecutive spoken interpreter services. When the same Can I make sure that I understand the extent of your argument? Are you saying that it's interpretation, oral interpretation, just in the courtroom? Well, Justice Sotomayor, I think that it's a — that there is a textual ambiguity in the statute about the extent of covered spoken interpreter services. One could argue it either way. And we don't — I'm happy to proceed under either assumption. But what's clear is that, however far it extends within the area of spoken interpretation, document translation is — I have to say that if you read it the way you do, then what you're suggesting is that for appointed experts, they only get recompense for the time they're testifying? Because that's the only time they spend in court. Court-appointed experts, Your Honor? Yes. I think that the legislative history of that seems to indicate that that provision was actually inserted into 1920 Parent 6 for a separate housekeeping reason, because it paralleled Rule 706 of the Federal Rules of Evidence, which was a preexisting rule addressing court-appointed experts, and simply put it into the enumeration. But court experts get paid for their prep work. Yes, Your Honor. I think that that may well be the case. But I think that the text… Could I — one further question? Of course. I take all your arguments, but I read the common dictionary, and there's no question that the primary meaning of interpreter is interpretation of oral languages. But the dictionary is broad enough to include translation work as well. Sotomayor, given that the courts for 70 years have been awarding most of them, except for, I think, the seventh year, virtually every court over a 70-year period has been awarding translation fees as authorized, why shouldn't that be enough for us? Meaning, if the dictionary term is broad enough, and that's what the courts have been doing, and the world hasn't crashed, despite one case where a large amount was given, your adversary points to the fact that most of the translation fees tend to be fairly reasonable. Why should we muck with what works? Well, Your Honor, I think that… Sotomayor, I think I'm drawing from ways that my colleague next to me usually asks a question. Your Honor, I think that the primary reason why the Court should not adopt that is because it's inconsistent with the text. It's wrong, is your answer, right? Yes, Your Honor. And it's also worth noting that the courts of — none of the courts of appeals who have adopted this construction of 1920 Parent 6 have considered or addressed our primary arguments in this case. They haven't addressed the uniform professional literature addressing this topic, the dictionaries and their aggregate, the administrative office's interpretation of this statute, the consistent congressional distinction between written translation and spoken — spoken interpretation that run throughout the Code. So just out of curiosity, why do you think that all these courts just took for granted the opposite reading? Well, Your Honor, I'm not sure that I have a good answer to that. Perhaps that they weren't presented with some of these arguments and didn't have the opportunity to consider them. Perhaps it was Dr. Johnson's answer when a lady pointed out an error in his dictionary, and his answer was, stupidity, Madam, sheer stupidity. I think, Your Honor, that Camp Pacific disputes very little of our central argument Their discussion of the courts of appeals is that there are lots of regions of the country, Puerto Rico, for example, where there are vast numbers of documents that have to be translated if you go into Federal court, not necessarily in the Commonwealth courts. That's expensive to people. And they might have thought for a long time, while that expense won't go away, it's at least better to have it paid by the loser than to have it paid by the winner. That's been the common practice. I don't think that's a foolish approach. And you can find language in this, which is to go back, to go back to Justice Sotomayor. Well, Your Honor, I think that, again, the best reason to reject that view is because it doesn't make a coherent whole of the statute. These provisions operate together in a uniform set of – as a uniform set of policies for addressing a common subject. And the way that these provisions interact in broad strokes that make perfect sense on our reading is that in the primary class of cases that motivated the passage of this statute, namely cases brought by the government where there were significant constitutional confrontation clause concerns about criminal defendants not understanding the spoken proceedings, in those core class of cases, the Congress elected to pay for spoken interpreter services directly in the first instance. Now, in the non-core class of cases, private civil litigation, the Congress elected not to pay for these services, but in 1920, paren six, to facilitate them in the lesser manner of providing that a party that incurred these expenses could recover them at the end of the case if it went. Breyer, what do you think of the – I mean, the First Circuit went into this, which deals a lot with Puerto Rico, and it felt that this fell within the idea of fees for exemplification, which is certifying a document. And in fact, to certify a document that comes into the Federal court in San Juan, you have to have it translated very often. And so the translation cost is at least consistent with the idea there of trying to – you may, you don't have to, you may impose the cost on the loser. Well, Justice Breyer, there was actually a specific provision in this bill, in a prior version of this bill, that addressed the context of Puerto Rico. And the significance of that provision is that when the Congress was addressing written translation, which was part of the – part of that provision, it specifically used the word translation to refer to that. And this just, again, confirms that the usual congressional practice of differentiating between these terms in statutes generally was fully applicable here, that the Congress knew the difference between these terms, used them appropriately. And the fact that, having removed that provision from the statute, the statute as passed contains only the words interpreter and interpretation and no forms of translate, just again reaffirms that the ordinary meaning of these terms should apply. And I think that's what we're trying to do here. Ginsburg. What of the document that's read out in open court, and it's a document, a contract in another language, and the interpreter, the witness presents the document and the interpreter interprets it? Your Honor, the professional literature addresses this as a site interpretation or site translation. And it's uniformly recognized to be a species of interpretation. It occurs, the interpreter speaks aloud in the presence of the audience being communicated to in the course of a spoken proceeding. But what if the interpreter, being diligent, said I'm going to have to translate this document in open court, I'd like to have it in advance so I can be sure that my translation is going to be accurate, so that in fact the interpreter looks at the Well, Your Honor, I think that the preparatory work that occurred outside of court would not be compensable interpretation work. But when the interpreter returned to court and gave the oral interpretation of that document, that would constitute interpretation. But that's what she's not interpreting it. She's already got the thing in whatever language, English, I guess, but I mean, she's not interpreting, she's reading the English translation. That's true, Mr. Chief Justice. But the key reason why that would constitute interpretation is because the interpreter is speaking aloud, communicating in the course of a spoken conversation to an audience who doesn't speak English, or who's or. Roberts, I misunderstood the hypothetical there. I'm sorry. Well, perhaps I did, Your Honor, and I apologize. I thought it was a situation where you've got a document in, say, French, and the I don't want to prejudge the issue, and then in English, and then the person reads the English thing in court. That's not interpretation at any point, is it? Well, Your Honor, I think that the literature does typically class the in-court oral communication of its content as a form of interpretation. But any ambiguity on this point really, really doesn't affect anything in practice. I mean, any site interpretation occurs as a brief interval in a larger procedure. Well, is it true that as a matter of common usage, when we are talking about oral testimony in court, we often use interpretation and translation, or interpreter and translator, somewhat interchangeably. But when we're talking about rendering a document into a different language, we generally talk about that as translation. This is a matter of common usage. Do you think that's correct? If I understand Your Honor correctly, yes. I think that the ordinary meaning of translate applies to the context of the communication of information in written documents. And it's discreet from interpretation, which is limited to the court. Well, you didn't understand the question. That wasn't quite my point. My point was that I think we say, in fact, in a Supreme Court case, we've said in the Supreme Court case, when we're talking about oral testimony in court, we tend to use translator or translate and interpreter or interpret somewhat interchangeably. Is that correct? I apologize, Your Honor. Yes. You can use the word translate generically. There's no question. Frequently in court, and I think out of court as well, that some people can use the word translate in a manner that doesn't differentiate between modes. Our point is that that double meaning doesn't apply to interpreter, which has a single narrow meaning limited to spoken communication. And Can Pacific's discussion of the dictionaries is limited to a single dictionary, Webster's Third. The majority of dictionaries categorically exclude document translation from the scope of an interpreter. Webster's Third, as I recall, is the dictionary that defines implied to mean infer. It does, Your Honor. And infer to mean implied. It's not a very good dictionary. Well, the Court in the MCI against AT&T case did indicate that. But in any event, the — on its terms, that definition supports our reading over Can Pacific's, because it does indicate, even as to that dictionary definition, that the most common meaning of the term is the meaning referring to spoken communication. And this Court frequently looks to the most common meaning for purposes of statutory interpretation, as it did in Mallard, in construing the word request, and in Ramsey, in construing the word envelope. Sotomayor, can we go back to the issue in the legislative history of this provision? Is there any indication that Congress explicitly rejected translation work from its coverage? Well, I can talk — there's a — the text does. I mean, the text of the — Outside of the text. Is there a statement by one of the sponsors in the congressional bill? I'm not sure. I'm sorry. I'm not sure that there's an explicit statement that I'm aware of in the legislative history. There's a lot of provisions in the legislative history which plainly presuppose that. And the Congress received professional literature from documents from the American Association of Language Specialists. Those are the other provisions that they passed with respect to? Well, specifically with respect to costs, the Congress, the House report alludes to Rule 43F, which is now 43D, as a relevant preexisting rule. And, of course, it's undisputed that Rule 43D's cost provision is limited to spoken communication of interpreters. So there is that in the history as well. But I think that there's no doubt that under the text of the statute, subject subsection K, the modes subsection, which appears at page 5A of the red brief appendix as it was initially passed, expressly says that the interpretation under this section must be done using methods that all agree are limited to spoken communication. Now, in the case of this case, it's not limited to spoken communication. Sotomayor, so if a lawyer sits down with an interpreter now in his office and says to the interpreter, I can't pay for translation work, now you sit here and interpret what this letter says for me, is that what we're asking lawyers to do now? Not at all, Your Honor. Do we accept your reading? No, Your Honor. That would not constitute interpreting because it would not be the interpreter would not be communicating between live parties in the context of a real-time receipt. But you would say that might be different in the courtroom? Well, because the lawyer is communicating something live. It could be in the courtroom, but not outside. That's correct, Your Honor. Is there something logical about this? Yes, Your Honor, because in the courtroom, in the context of a live spoken proceeding, that satisfies all of the ordinary definitional elements of interpreting. But that's not the case in somebody's office in the presence of a single party and a written document. And in the — there's no question, Your Honor, that to the extent there's any ambiguity with respect to unusual examples, this is a distinction that's absolutely clear in the vast majority of real-world incidents. What about depositions? The translation would be of the spoken word, but it wouldn't be in court. Well, I do think there — one could potentially argue that spoken interpretation at a deposition isn't covered in light of some of the dictionaries, like Black's Law Dictionary, which indicates that the word is restricted to people who work in trial. But I certainly think that it could be argued either way in the case of a deposition. Well, what's your position? I take a deposition in my law office and I have to have an interpreter there. Is that recoverable or not? I'm not sure we have a definitive. I mean, I think you could argue it either way, Your Honor. It doesn't affect our case. Well, how do you think it affects the way you read the statute? What do you think should be the result? Well, I think there's a reasonable reading that that should be covered. I think that that's certainly considered — we have no vested interest in opposing that. I mean, that — Let me ask you this question. In the background here, is there some concern that we're going to have minor cases, but with huge translation costs, and it would be simply unfair? And if the answer to that is yes, isn't that taken care of by the statutory direction that the Court may give costs? Well, Your Honor, that sort of discretion demonstrably does not prevent the issuance of these larger awards, because there have been a number of larger awards issued notwithstanding that discretion. Well, isn't that an abusive discretion? Well, not necessarily, Your Honor. The district court — I mean, in other words, if the Court sees that the cost of preparing documents into an English language is quite substantial in light of what's involved in the case and it's just not fair to award them, can't that court in its discretion deny that? Or is that not the way it works? That's the way it works, Your Honor. But I don't think that that discretion is sufficient to eliminate the deterrent effect that this Court has recognized in cases like Farmer v. Fleischman, because it occurs at the end of the case, after a litigant has already decided whether to bring suit. The deterrent effect occurs ex ante when a risk-averse litigant has to decide whether to bring the case. But I would just note that these sorts of policy questions, Your Honor, arise in the context of language that by its terms extends to interpreting and not translating. And we would say that the relevant policy question is simply whether there are sensible reasons that Congress may have drawn the line where it did. And plainly, there are adequate reasons that these services, document translation services that were excluded, are potentially large and fall under the general principles that this Court has recognized are presumptively not frequently  Sotomayor Yes, I'm having a problem with, you know, they're potentially large. Interpretive services are potentially large. Although you claim that they don't they have sort of a terminus point, I've been in trials where we've had multiple languages simultaneously being translated to multiple defendants with witnesses speaking even other languages. I was in the Southern District of New York. And fees there, without translation, just for the oral courtroom work, sometimes went ahead for months. So potentiality is not the question. If you're talking about disproportionality, then that goes to the word reasonable in the statute, doesn't it? I mean, the ortho case you point to, the Court did sizably cut the translation fees, and more importantly, from the little I can tell, that was a huge patent case with a patent that was claimed to control 60 percent of a market. So I don't know that that was a small case by anyone's definition. Certainly, Your Honor. As to the difference, I mean, I'm not aware of under this statute an interpreter's spoken interpretation award approaching anywhere near some of the larger document translation awards that have been issued. But nonetheless, I'm not denying that there could be large interpreter awards in some cases, but the fact is that adding on document translation awards is additive. The sort of necessity review that would be necessary to police these document translation awards would be quite burdensome on the district courts. And in fact, the necessity standard is actually particularly problematic to apply to translations, Your Honor, because the fact is you don't know what a document says until it's been translated. And the exercise of trying to go back and reconstruct ex ante what a — whether a person was reasonably necessary in causing to be translated something that they didn't know what it meant is likely to lead to very subjective— Breyer, why haven't the — I was interested to hear that the amici on your side consist of some professors in the, I guess, the Trade Association of Interpreters or translators. But the people who would have the financial stake in it, the defense bar or the plaintiff's bar in some circumstances, have not filed any brief. And I tend, though not putting a lot of weight on it, to take it as a sign, along with the long period of time, that there hasn't been some tremendous financial problem. What evidence is there that there has been, a few cases, but in general? Your Honor, I'm not at all suggesting that there's been a tremendous financial strain on the system. We're saying that this is a statute that, by its plain language, extends to— As a plain language argument, I got. But how many years has the great bulk of the Court been going the other way? I'm sorry, Your Honor, I actually — I didn't hear the end of your question. How many years has the, would you say, the great bulk of the Federal system been deciding this differently from the way you think it should be? I'm not sure that it's the great bulk. I mean, there's been a significant disagreement. As the bulk? Well, I think it's — I think that it's increased over time as the— Well, when did all this rot set in, in your opinion? How long? I'm not sure that I can pinpoint a date, Your Honor. What's the first one? Your Honor, I'm not sure. I'll have to find out while my adversary is arguing what the first decision is. It was a district court, but it was as far back as the 1930s. Some in the 40s, some in the 50s. Well, certainly it wasn't construed in 1920.6 at that time, Your Honor. No, no. Clearly. But its awards have been common. Your Honor, addressing— You've got a case cited from 1812, I take it. That doesn't necessarily concern me, Your Honor. Addressing— I thought we were addressing not whether it's a good idea to give fees, but whether fees are payable under this particular statute, right, which was enacted when? 1978, Your Honor. 1978. And— That's not so long ago. Absolutely correct, Your Honor. We agree. And the structural reasons are within the Court Interpreters Act itself are every bit as powerful as the ordinary textual indicia that support our reading. And in fact, Camp Pacific's argument that the word interpreters should be assigned different meanings in different parts of the statute is unsupported. Camp Pacific relies on what it characterizes as different language in section 2, which put in 1827 and 1828, and section 7, which put in the cost provision. And it notes that section 2 sometimes uses the broader phrase, interpreters in courts of the United States, whereas section 7 uses the word interpreters alone. But Camp Pacific doesn't examine the context in which section 2 does and does not use that broader phrase, and those specifics really undermine any argument I might make along these lines. As originally passed in section 2, 1827 contains 26 occurrences of the word interpreter, not counting the title. And of those 26 uses, 24 simply use the word interpreter by itself. So there's certainly at the very threshold no overarching pattern of usage distinction between them. More fundamentally, though, the substantive provisions addressing the use of interpreters by parties in these cases in 1827 do so without using that broader phrase. Subsection D. Scalia, do so without. I'm sorry, Your Honor, without using the broader phrase in courts of the United States. Subsection D is the provision that governs the use of interpreters in cases brought by the government. This appears at page 2A of the red brief appendix. And it simply provides that upon a determination of need, the services of an interpreter will be used in these cases. The only two provisions that use the phrase interpreters in courts of the United States are subsections A and B, which are both at 1A of the red brief appendix. And both of these provisions simply are addressing the scope of the administrative office's duties under the statute. And as such, it simply makes clear that in keeping with the office's ordinary functions, it's facilitating the work of the Federal courts and making clear that the office isn't, for instance, certifying interpreters for the State courts. So nothing in this language suggests in any way that the word interpreter means something different in different places or that the services of an interpreter are viewed as embracing the same thing. So we think that a variety of indicia of meaning converge in this case to support the conclusion that 1920, parent 6 is limited to spoken communication. If there are no further questions, I'll reserve the balance of my time. Roberts. Thank you, Mr. Freed. Mr. Himmelfarb. Thank you, Mr. Chief Justice, and may it please the Court. The word interpreter has two possible meanings that are relevant here, a broader one and a narrower one. The broader meaning is a person who translates from one language to another. Under this definition, the terms interpreter and translator are used interchangeably. Have you ever seen a book, you know, translated from a foreign language, you know, War and Peace, you know, and you're at the mercy of what we call the translator, and it says on the fly page, you know, John Smith, comma, trans, period. Does it ever say John Smith, comma, int, period? It's used in the narrower sense in that context, I think, Justice Scalia. The narrower meaning of interpreter is a member of a profession that specializes in oral translation, and in that narrower sense, an interpreter is distinct from a translator, which is the sense you've just identified, which is a person who specializes in written translation. Our submission is that, as the great majority of courts who have expressed a view on this question have recognized, the broader definition makes more sense in the particular context at issue here, and we say that for a number of reasons. The first is that the basic purpose of translation in the litigation context is to make evidence intelligible to the parties in the court. Section 1920 reflects a congressional judgment that the cost of making evidence intelligible to the parties in the court can be borne by the losing party. Scalia. Scalia. It reflects that judgment only if you're right that interpreter means translator. I mean, you're begging the question. You could say that the one should embrace the other, but whether Congress thought that or not is mostly dependent on the language Congress used, isn't it? Let me be as clear as I possibly can. I'm obviously not standing here saying we lose under the language, but it would be a good idea for the statute to cover written translation. That's not a legitimate enterprise for a court interpreting a statute. What I'm saying is that a text of the statute bears two, permissibly bears two possible meanings. That being the case, it is a legitimate enterprise for the court to say which makes sense, which is it most likely that Congress would have intended in this particular context. Alito Why does your interpretation make sense? Shouldn't we view this against the backdrop of the American rule on fees, that each person pays certain costs, and only in specific circumstances does the loser pay? Now, the taxation of costs is a very narrow concept. What is the difference between a case in which a lot of documents have to be rendered from one language to another prior to the court proceeding, and a case in which there's a mass of scientific evidence that has to be interpreted by a scientist or financial evidence that has to be interpreted by an accountant? In those instances, the losing party doesn't pay for the winner's expenses, does it? Well, let me address the first part of your question first, which is essentially, as I understand it, isn't there a background principle that says costs don't get taxed? I actually think insofar as costs are concerned, as distinct from attorneys' fees, the background principle actually goes the other way. Costs get taxed, but costs are very narrow. They are a very small part of the expenses of a party litigating a case. Isn't that true? I think ordinarily that's true, but I don't think that it follows in any way that there is some sort of tie-breaking interpretive canon that says when you're interpreting the cost statute, some version of which has been in effect since the middle of the I just don't think there's any such interpretive principle. Well, aren't you asking for an interpretive principle that errs on the side of breadth rather than narrowness? No, we don't. Why don't we just ask ourselves what's the most common, what's the best reading? Well, I think you obviously have to start there in this case, as you do in any statutory case, and our submission is that you have two possible ordinary definitions, you have two possible common usages. But the dictionaries themselves tell us that one usage is far more common than the other. I mean, I guess I just have to dispute that. We have Webster's, which, you know, Justice Scalia's view notwithstanding is viewed by many people as an authoritative dictionary of English language. We've got Black's Law Dictionary, which I think everyone agrees is the leading law dictionary, which provides as a definition of interpreter the broad definition that we advocate here, to be sure. Scalia. Well, I guess Black's Law Dictionary, which the editor of it is a co-author with me, so I feel obliged to spring to his defense. Since it is a law dictionary, presumably it ought to have taken into account the cases you're referring to. Many of which use the word in this sense, right? That's true. That's absolutely true. And just as a dictionary, a law dictionary will take those cases into account, I think it's ordinarily presumed that Congress is taking into account the cases too, and it's taking into account dictionary definitions as well. One of the things that concerns me is the impact of cost allowance on the normal litigation incentives. An interpreter in court is one thing. When you suddenly get a situation where the cost could be quite large, particularly in a disparate way, not necessarily shared by both sides, somebody goes into court, they know they're going to have to — if they lose, they'll have to pay an interpreter this, and the other side comes in and says, well, we think we need to submit this 10,000 pages of documents, which will have to be translated, and by the way, if you want to do that, that is a much more variable element of costs than the interpreter. I'm not sure that's true. I think in large litigations where you have many, many days of trial and potentially pretrial proceedings, you could have very large oral translation costs. Where there are many depositions, you could have large oral translation costs. But even if I were to accept the premise of your question, it seems to me that the way these costs get controlled is through the exercise of district court's discretion not to tax every — the cost of translating every document. The Fifth Circuit, which is one of the ones that does that, is one of the ones that does that. Roberts. So what goes into the exercise of that discretion? Well, typically the criteria for — I should add, the criteria for taxing costs of every sort, not just interpreter costs and not just document translation costs, are essentially thought to be necessity and reasonableness. So in connection with document translation costs, the Fifth Circuit has suggested that the way to tax them, the appropriate way to tax them might be just to tax the cost of translating headings of foreign language documents, which should be sufficient to let the lawyer know whether this is a relevant document that might bear further translation. And then only the documents that really turned out, based on the translation of the heading, to have some significance to the case. So that's just one example of the way the discretion gets exercised. Ginsburg. Mr. Himelfarb, in Section 1920, there are two provisions that specify costs necessarily obtained for use in the case. And the interpreter provision doesn't have that qualification. It doesn't say necessarily obtained for use in the case. That's true. For the— You are asking to read interpreter to mean translator as well and to import into sub 6, necessary for use in the case. The necessity limitation in subsection 6, as with other subsections that don't specifically use the word necessarily, come not from that term, but rather from the word may in the first sentence of the provision, which in tandem with Rule 54 of the Federal Rules of Civil Procedure essentially make this a discretionary call for the district court. Necessity has long been recognized as one of the components of that discretionary determination. The reason we say it doesn't make sense to have the narrower definition of interpreter be the one that Congress enacted is that written document translation can be and often is every bit as important as oral translation. In many cases it could be more important in a contract case, for example. Breyer. What do you think on the difference? I guess nobody wants to defend this argument, including you, but the First Circuit and several others did look to the provision which permits the taxing of costs for the making of, it says exemplification of official documents, for the cost of making copies of any materials obtained for use in the case. Now, if you're going to make a copy for use of a case of something in Japanese, you're going to have to turn it into English. So they included that as part of the cost of making copies of a material, of a document for use in the case, which is discretionary as to whether you do it or whether you don't. But that's how several courts did read it. I'm just wondering if that didn't strike me so obviously wrong. Maybe it's obviously wrong. Well, I mean, I suppose it goes without saying that we'd rather win under subsection 4 than lose under subsection 6. There are some. I'm sure you'd like to win on any subsection. That's true, absolutely true. There are some courts that have suggested that document translation fits under subsection 4. I think those that have done so have tended to do it, tended to do it before section 6 was added in 1978. We haven't. Breyer, I'm sorry, the history is that prior to 78, a serious number, some number of circuits said you can get the translation paid for as being necessary to create a copy that's usable in court. All right. Then Congress passes this, knowing of those cases in principle. And then there is a shift after Congress passes this, and then the majority of courts say, all right, this is the provision that permits it. Is that an accurate statement of what happened? I think that is accurate. Before 1978, some of the courts that taxed document translation costs, I believe, also relied on their inherent authority, which at the time was thought to be a permissible ground to re-inherit. Is there anything in the history of the 78 statute which suggested that Congress didn't want these taxed? Absolutely not. There is frankly nothing in the legislative history of the Court Interpreters Act really that bears on this issue one way or another. There is a lot of legislative history on which Petitioner relies, but it's all addressed to section 2, which is a separate provision which deals with a separate subject, which is the appointment of interpreters in cases initiated by the United States. So if there is no legislative history, there is no legislative history on the other side either, right, saying that we mean this to the interpreter. Well, that's right. We don't. So absent legislative history, I guess we have to rely on the words of the statute, right? That means you don't have to look at the statute. I guess I would just go back to where I started, which is that we think under dictionary definitions and under common usage, there are two permissible meanings of interpreter. Well, there are two — there may be two permissible, but you don't dispute the fact that it is more natural and common to speak of someone interpreting oral communication and someone translating written, correct? I don't — I think I would dispute it. I don't know whether one is more common than the other in any meaningful way. It may be slightly more common to use it in its narrower sense to refer to a member of a profession, but it's certainly common enough that you have district judges from all over the country in written opinion just sort of matter-of-factly talking about the people who translate documents as interpreters. How about in the U.S. code? Is there any place in the U.S. code where the word "-interpreters clearly encompasses written translators"? I'm not aware of any. There aren't – I frankly don't think there are that many places in the U.S. code where the term interpreter is used other than in its sort of obvious, narrow sense based on the context of the statute. So, for example, a number of statutes talk about funding translators and interpreters who are not citizens of the United States. It seems to us that in that context what Congress is getting at is the interpreter and translator in the narrower sense of members of a profession. Kagan So in every other case in which the U.S. code uses the word, interpreters means only oral translators, and that's the obvious way to use the word. But in this case, we're supposed to reach a different conclusion. I – Justice Kagan, I would say this. In every other provision of the United States code in which the word interpreter  the context is such that it strongly indicates that it's limited to oral translation. And neither of those situations obtains here in our view. Roberts But just to phrase your answer a different way, you don't know of any situation in U.S. code where translators mean – interpreter means translator? Kagan I'm not aware of any other provision in the United States code. Roberts And you checked every one, so there is none, right? Kagan There's none where it is clear that it covers document translation. There are – there are State statutes, which we've cited, which use the term interpreter to clearly cover document translation, and we cite them in our brief. Alito Suppose somebody did a computer search in a database of, let's say, newspaper articles, magazine articles, for use of the term interpreter in relationship to a foreign language. And let's say you look at 1,000 hits. How many of those do you think would use the term interpreter to refer to rendering a written document from one language to another? Kagan I think it – I would not be at all surprised if it was more than 50 percent of the hits that used it in its narrower sense. Kagan You're, like, daring Justice Alito to go do this. Alito However, there's – Breyer How much would you bet? If you bet me enough, I'll look at 1,000. I'd be surprised if it's 2 percent. Kagan I couldn't venture a guess, and I'd rather not bet you. I do want to say something about the concept of cite translation, which is something that my friend, Mr. Freed, adverted to. Cite translation is a hybrid endeavor. It is the oral translation of written documents. One of the reasons we think that the broader meaning of interpreter makes more sense in Section 1920 is that it can't really account in any sensible way for cite translation. In this case, for example, our counsel, Camp Pacific's counsel, took Taniguchi's view, having those documents translated in writing to prepare for the deposition would result in a potentially taxable cost. Under Taniguchi's view, they wouldn't, but it sounds like under either party's view, if instead of handing those documents off to a document translator to have them translated in writing, he had sat down in his law office with a member of the interpreter profession and said, here's a box of documents, please tell me what they say, that would be a potentially taxable cost. That seems to me to be a very odd result, and one that's not. Roberts And it's an odd result because nobody's going to do it, because at that point you don't know who's going to get saddled with the costs. So it wouldn't be likely that you would do something that would increase the costs, would it? Well, I don't know that it would increase the costs. It may be cheaper to use an oral translator as opposed to a written document translator, and there might be a variety of reasons why you would choose to use one or another, time constraints, the importance of the particular document, what have you, but I don't think that it's likely that Congress would have thought that the use of a viva voce translation outside of court is covered by the meaning of interpreter here. I assume that the interpretation here meant interpretation in the oral proceeding that is the trial, and you're saying that if we hold against you, interpretation will still include all oral translations outside of the trial. Well, I think every court that's ever thought about this has found that deposition oral translation at deposition Oh, at deposition, which I consider part of the trial process, but not in the lawyer's office where he has somebody to sit down and read this document to me. Well, there's not — I don't see any basis in the statute or, frankly, in the practice of translators or interpreters for drawing that line in that particular place. And as far as the question where Taniguchi would have the court draw it is concerned, I think that's a very hard question to answer because he's moved back and forth so many times on that. His briefs offer several different, several different narrow definitions of interpreter, sometimes saying it's the oral translation of oral speech, sometimes saying it's the oral translation of any language, whether it's oral or written, sometimes saying it's limited to in-court interpretation, sometimes it's saying it's not. That, it seems to us, is a very good reason for adopting the broader interpretation. It seems very unlikely that Congress would want courts to get into these extremely complicated and, frankly, unprincipled line-drawing exercises. Kagan. Well, I don't know, Mr. Hemelfarb. I mean, why is this any different from any case in which we draw a line and we find that the result of drawing a line is that we've created some close cases, cases that are near the line? So, you know, just to give you an obvious example, the fact that there are some few minutes in every 24-hour period where it's hard to say that something is night or day does not mean that there's not night and that there's not day. And that seems to me what the question is here. Yes, you can think up some hard cases, but they're just that, they're marginal cases. Well, I think, I think line-drawing is sometimes a necessary exercise because the text of the statute compels you to do it. Our submission is that the text of this statute doesn't compel it because you've got a readily available alternative interpretation which doesn't require any sorts of these line drawings. And as far as whether this is sort of an outlying, the examples I give are outlying oddball circumstances goes, I don't think they are. Sight translation, for example, is a core function of interpreters and translators alike. And I guess the only other point I would say, make about sight translation, my friend Mr. Freed suggested that that, that is something that could only be covered if it takes place during the course of live proceedings, which I think is, is yet another narrowing of the word interpreter. But as far as I'm aware, most sight translation does not, little if any sight translation actually occurs during the course of a case. Breyer, I accept, I accept the following, that there was a history basically giving, doing what you want before the statute, but the statute, nobody thought what it was going to do to that history. That that statute is capable of being translated, but that isn't the most natural thing. And so the question is, do we take, go with a smaller capability saying, leave, leave well enough alone, or do we say, gee, that's just too hard to translate it that, to interpret the statute that way. Have you got any other example in the law? I mean, can you think of an example in the law, which I've been trying to think of, where there was a history of doing something. A statute comes along that makes it a little tougher for the judges to do it, and then the court says either, sorry, too tough now, or it says let sleeping dogs lie. Well, I think, I mean, it, I think it's an important point, and this goes to the question of, you know, whether it's difficult for district courts to make a determination of whether a particular document translation should be taxed, which is one of the arguments on the other side. I think the history of this is strong evidence that it's not difficult. Courts have been doing this certainly since 1978, when this provision was added, and even before then, and they haven't had any evident difficulty in deciding whether to tax documents and if, document translation, and if so, how much. So I think the history certainly bears on the case in that respect. A word. Sotomayor, can you think of an example where words are not on their face plain, and the court has looked to the practices that have been imbued into that word and said, and we've decided that they will be accepted in the way that practice has given the meaning? I can't think of any case off the top of my head, and I think it's true that this case is a little bit different, because insofar as courts were taxing document translation costs before 1978, they were relying on something other than the word interpreter. So it may be a stretch to say that when Congress chose to use the word interpreter, it was necessarily incorporating what courts had previously done, but I don't think it's entirely irrelevant that this has been done for a long time, and I think it's not unfair to presume that Congress would have been aware of that. The Court Interpreters Act has two main provisions as relevant here. There's Section 2, which is really the more — the main provision, and then Section 7, which became 1920 subsection 6 in Title 28, which is the provision at issue here. An important part of Taniguchi's submission is that Section 2 is limited to oral translators, and therefore, it should follow that Section 7, the provision at issue here, is likewise limited to oral translators. And our main submission on that question is that Congress actually used different language in Section 2 and Section 7. Section 2 added two provisions to Title 28, Section 1827 and Section 1828, which are titled and which address, respectively, interpreters in courts of the United States and special interpretation services. In Section 7, which added subsection 6 to 1920, Congress does not use those two phrases. Instead, it uses the phrase interpreters simply, not interpreters in courts of the United States, and then special interpretation services. So to the extent that there is any appropriate canon about the use of similar or different language in different provisions of a statute, it seems to us that the appropriate canon is that one should presume that when Congress uses different language, it intends different meanings. I do want to respond to Mr. Freed's point about the number of times the word interpreter is used in Section 2. And as I understand his point, it's that it's much more frequently used by itself than it is with the words in courts of the United States. What the statute actually does is add, say that it's adding Section 1827, which it calls interpreters in courts of the United States. It then has a subsection that says that the administrative office of the United States courts has to establish a program to facilitate the use of interpreters in courts of the United States. Roberts. Where are you reading from? I'm sorry. This is the red brief, 1A, the appendix, which is the very beginning of the Court Interpreters Act. And then there is subsection C, flipping over to the next page, I'm sorry, subsection B, which says that the director has to certify interpreters in courts of the United States. So what it does at the beginning of the statute is establish this thing called a certified interpreter in courts of the United States. When it thereafter speaks of interpreters simply, that's just a shorthand for a certified interpreter in courts of the United States. So it seems to us that as far as the Court Interpreters Act is concerned, even if it's true that Section 2 uses the term in the narrower sense, it doesn't necessarily follow that it's used in the narrower sense in Section 7. And the only point I would add about that, as we point out in our brief, it's really not clear that Section 2 is limited to oral translators. Soon after the Court Interpreters Act was enacted, and for approximately 16 years thereafter, the administrative office would publish these notices in the Federal Register notifying the public that there were going to be certification exams for interpreters under Section 2 of the Court Interpreters Act. These were pretty streamlined notices, not long at all. And one of the main aspects, the main sections of the notice was a list of what the director of the administrative office said were the duties of interpreters in courts of the United States. And to be sure, it listed simultaneous and consecutive interpreting, but it listed site translation and it listed document translation. So at a minimum, Section 2 is not sufficiently clearly limited to oral translators that the director of the administrative office couldn't issue these notices saying otherwise. I guess the last point I want to make about other statutes, some of which use the term interpreter and translator together. I've already addressed that in part by saying that in many of those statutes, it really is pretty clearly used in the narrower sense because you're talking about members of a profession. The only other thing I would say about that is that the premise of Taniguchi's reliance on those statutes seems to be that it would be strangely redundant for Congress to speak in other statutes about interpreters and translators together if, in fact, the two terms could be used interchangeably and that redundancy should be avoided. But subsection 6 of 1920 itself has a redundancy in it because it covers both interpreters and special interpretation services, and I don't think anybody could dispute that anyone who carries out a special interpretation service is an interpreter. So it's not at all odd to have redundancy when Congress is addressing the subject of translation. Roberts. Thank you, counsel. Mr. Freed, you have 5 minutes remaining. Very briefly, Your Honor, three points. In the first place, Justice Breyer, I just wanted to let you know that the first decision, the first appellate decision construing 1920 paren 6 to encompass document translation was the D.C. Circuit's decision in the Quay in 1981. Second, Mr. Himmelfarb noted that Black's Law Dictionary takes a definition that arguably could encompass document translation, but he didn't mention that the operative version of Black's in 1978, when this statute was passed, was a different definition that excluded document translation. And this change in the definition occurred in 1999 in the 7th edition, after a number of these judicial decisions construing 1920 paren 6 had already come down, which supports Your Honor's observation that it could very well merely reflect a recognition of these decisions rather than independent support for them. Finally, Your Honors, Mr. Himmelfarb cited certain notices issued by the administrative office for many years ago. These brief notices were ministerial documents that simply announced a forthcoming examination. The office has issued the Guide to Judiciary Policy, which is the fully expressed views on this issue, and is posted on the office's website. It's current as of June 9, 2011, and expressly provides that document translation is not a part of the statutory services of an interpreter. If there are further questions, I would be happy to address them. Roberts. Thank you, counsel. The case is submitted.